## BOUKER CONTRACTING CO. v. WILLIAMSBURG POWER PLANT CORPORATION.
### THE 73-H.
### No. 15916.

District Court, E. D. New York.

Dec. 4, 1941.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for libellant.

William C. Chanler, Corp. Counsel, of New York City (George Seagrave Franklin and Martin Faust, both of New York City, of counsel), for City of New York.

GALSTON, District Judge.

The libel alleges that the respondent operated and controlled a berth for the loading of vessels adjoining the foot of Division Street, Wallabout, Brooklyn; that on July 7, 1939, libellant's dump scow, 73–H, light, arrived at the respondent's plant to be loaded with a cargo of ashes; that on the morning of July 8, 1939, the loading began and continued from time to time, the respondent's employees having shifted the scow to a different position at the berth. It is claimed that in so doing they placed part of the scow in a berth that was foul, as a result of which the scow sustained damage.

The proof discloses that on the morning of July 7th the scow was in good condition and had been engaged in carrying material in pockets and disposing of the cargo at sea or in Long Island Sound. She was one hundred and twenty feet in length and about thirty-five feet in width. There were six pockets in the boat, three forward and three aft of a division designated a bridge. When loaded the 73–H draws eleven feet, light about three feet. The Bouker Tug No. 6 towed the scow to the respondent's dock on the night of July 7th and she was there placed outside a deck scow, lying alongside the bulkhead. The following morning the respondent's crew shifted the boats so that the 73–H was placed inside along the dock and the deck scow became the outside boat. In this position the 73–H was ready for loading, with her port side to the bulkhead, the stern end of the boat lying towards Division Street. The position of the stern of the boat is one of the critical questions in the case. According to the bargeman, the stern of the boat lay about ten feet north of the respondent's property line and was then, so he said, in position with respect to the ash pit and the moving crane readily to be loaded without shifting the boat back and forth. With the stern even with the property fence and not projecting over the line, so the bargeman said, the crane could not have reached the bow pocket. After the 73–H was tied up on Saturday morning, the bargeman ascertained that there would be no loading that day or night. Though informed that the loading would begin Sunday, the bargeman left and did not return until Monday morning. At that time he found part of the boat submerged, the top of the cabin and stern visible, the boat listed to starboard and lying about twelve or fifteen feet off the dock with only one line left, the others having parted.

It was Petersen's, the bargeman's, testimony that there was a "lump" on the bottom along the bulkhead, at or near the sewer pipe outlet at the foot of Division Street. This condition he had observed on a prior occasion. He had then complained to the foreman and the engineer on the crane but was told to see the "chief". He testified that he told that person, otherwise unidentified, about the condition at the foot of Division Street. Accordingly loading was then suspended until the tide rose. He had had no other similar experience and never, though he was at the dock frequently, had he found that it was necessary to stop loading because of this lump. All of the employees who were called by the respondent denied ever having had any such conversation with the bargeman. This prior occasion was at some time in the spring of 1939, a few months before the happening of the accident involved in the present libel. The witness also said that he reported the condition to the captain of the Bouker No. 6, the tug owned by the libellant, but made no report to the captain who brought him in on July 7th.

The bargeman admitted that when the 73–H was shifted on the morning of July 8th to the same place in which he had had trouble before, he made no protest to anybody.

The answers to libellant's interrogatories disclose that the 73–H was not shifted during the process of loading, nor after the loading was completed, and also that when the loading had been completed and the 73–H was discovered in capsized condition she had remained approximately at the same spot slightly off shore. The respondent's answer also discloses that "on the morning of July 10th, shortly after mid-

night, the loaded scow was observed to list, and shortly thereafter sunk."

Edwards, the engineer in charge of the watch at the power plant, though employed from fifteen to twenty years, testified that he had never received any complaint about this berth, nor did he ever hear of any complaints concerning the bottom alongside the bulkhead described by Petersen. Dunham, libellant's dock foreman, employed in that capacity since 1927, also testified that he had never received any complaints from anybody concerning the alleged lump or obstruction on the bottom. It appeared that though soundings of the bottom sixty feet out from the dock and for about five hundred and ninety feet from the gas house end of the property to the property fence at the north, had been made by the respondent on May 29, 1936, none had been taken thereafter up to the time of the accident.

The respondents, on July 13, 1939, after the accident, took soundings at the northerly end of the bulkhead and at the property line. These soundings show that at the northerly end of respondent's property there were but seven feet of water at the bulkhead, and ten feet out, again, at the Division Street line, but eleven feet. These and other soundings taken indicate that the depth of water alongside the bulkhead at the northerly end of the bulkhead was insufficient to float a loaded dump scow having a draft of eleven feet, this being the draft of the 73–H when loaded. It is quite clear then that at low water the in-shore corner of the barge could have been hung up causing the vessel to list off-shore as well as forward, as testified to by Petersen, the bargeman.

Hauk, assistant foreman at the plant and employed for twenty-seven years, likewise said that no one had ever complained to him about conditions of lumps or bumps on the bottom where the 73–H was loaded. He also said it was the rule of the company to keep the scows to be loaded inside of the company line, though he admitted that light boats were sometimes outside the line.

Busch, who was watch engineer on the night shift, had never received any complaints. So also neither Warner, assistant supervisor of operation of the entire station, nor Farrigno, who was screen-house operator, nor Otto, the chief engineer of the plant, also long in the company's employ, had ever received any complaints concerning the berth.

It may be observed that after the 73–H was sunk, within a week or two the bottom was dredged, but the explanation is that the Bouker had removed ashes from the bottom which the salvage company had released from the pockets after that company had raised the boat. And then some time in December the Arundel Corporation did extensive dredging in the channel.

■ It must be concluded that the sinking of the 73–H was due to a bad berth and that this berth was chosen by the respondent, and its responsibility attaches in consequence thereof. The Eastchester, 2 Cir., 20 F.2d 357. The respondent seeks to avoid responsibility because of provisions in the agreement made between the Williamsburg Power Plant Corporation and the Bouker Contracting Company on January 3, 1939, which, it asserts, relieves it of liability for negligence. In this contract, the Bouker Contracting Company agrees to remove the power house ashes and waste material by means of deck scows. The loading, however, was to be carried on by the Williamsburg Power Plant, and on notification from the Power Plant that the scows were loaded, the scows were to be removed promptly by the contractor. It was provided that in the event that any of the scows be permitted by the contractor to occupy a berth alongside the station for a period longer than twelve hours after the loading had been completed, the corporation reserved the right to remove the ashes and to utilize the scows in removing and disposing of such ashes. Paragraph 5 of the contract provides that: "The 'contractor' assumes all the responsibility and risk incident to the work herein contemplated to be done by the 'contractor' including those risks arising from the negligence or the alleged negligence, or acts of nuisance or alleged acts of nuisance of any person engaged in or connected with said work, and the 'contractor' further agrees to indemnify the 'corporation' and save it harmless from any and all expense in connection with and liability for claims * * * for damage of any kind arising out of * * * said work," but concludes with this significant limitation: "The 'contractor' shall not be liable for any negligence of the 'corporation' or its employees."

■ Thus it seems entirely clear that the Williamsburg Power Plant Corporation would itself be liable for any damage to this scow which was caused by the negli-

gence of the corporation or any of its employees.

More important, however, is the claim of the respondent that in leaving the scow unattended, the Bouker was negligent. Captain Petersen, who knew about the uneven bottom, and who, so he said, had made a previous complaint, does not establish by persuasive testimony that he gave notice of this uneven bottom to any identifiable representative of the respondent. Moreover, though the captain knew that the boat was to be loaded, he left his boat unattended during the process of shifting and loading, and indeed did not return until the damage had been done. There arises then the speculation as to what the circumstances would have been had the bargeman remained in attendance when the employees of the respondent shifted the barge so that its stern projected over the respondent's property line to the north. The answer to that is readily found in the bargeman's own knowledge of that foul berth. Had he remained it is more than likely that he would have protested. Certainly it would have been his duty to make protest.

I think it must reasonably, therefore, be concluded that the bargeman's absence did contribute to the sinking.

The libellant may have a decree but for half damages. Submit findings of fact and conclusions of law in conformity with the foregoing opinion.